JOURNAL ENTRY AND OPINION
{¶ 1} The appellant, Deshawn White, appeals from his two convictions for felonious assault with firearm specifications following a jury trial, as well as the sentence of incarceration imposed by the trial court. After carefully reviewing the record and for the reasons set forth below, we affirm the appellant's convictions and prison sentence.
 {¶ 2} In April 2003, the victim, Nathaniel Woodland, was introduced to the appellant, Deshawn White, through White's father, Oscar Nicks. White was introduced to the victim only by his nickname, which was "D Money." Soon after their meeting, the victim began selling "dope" for White. The victim stayed at a home located at 2341 East 76 Street in Cleveland According to the victim's testimony, the home was actually a "crack-house," and the victim worked as the "doorman." Fifteen other people also stayed in the house, and the victim only knew them by their nicknames.
 {¶ 3} On June 10, 2003, the victim testified that White gave him five rocks of crack cocaine worth $100. He was told by White to sell the rocks and give him back $50 later that day. However, before the victim could sell the crack rocks, someone else living in the crack house stole them. On June 11, at around 12:30 a.m., White came to the crack house wanting the $50 from the victim. The victim stated he became concerned when he went out onto the porch to talk to White because he could smell PCP emanating from White. The victim told White the crack rocks had been stolen, and he could not get him the $50 until the next morning.
 {¶ 4} Without warning, White pointed a black, nine millimeter semi-automatic Glock pistol at the victim's head. White then lowered the pistol down towards the victim's legs and fired three times. The first round hit the victim in the left leg below his calf, shattering the bone, the second round grazed his right calf, and the third round missed because the victim jumped over the railing of the porch. After shooting, White ran across the street and disappeared through a vacant lot.
 {¶ 5} An ambulance arrived and took the victim to the hospital where he remained for eight days. Doctors replaced his shattered leg bone with a steel rod. While in the hospital, Detective Gilbert of the Cleveland police took the victim's statement and began an investigation. In his statement, the victim told Detective Gilbert that a man named "D Money" had shot him over $50 and described him as a black male with medium brown skin, 6-foot-one-inch tall, hair low, with a mustache, and about 23 years of age. The victim stated he did not know the actual name of the shooter and only knew him by his nickname, "D Money." The victim also told the Detective that "D Money's" father's name was Oscar Nicks, the area around town were "D Money" frequented, and the fact that "D Money" wore a bright yellow jogging suit at least once a week.
 {¶ 6} Detective Gilbert went to the police station and entered the names "D Money" and "Demerrius" into the police computer in order to find possible suspects. The search returned six possible suspects, and the Detective took photographs of the suspects to the victim for identification. The victim stated that none of the photographs depicted" D Money."
 {¶ 7} On June 21, 2003, Detective Gilbert received a tip that "D Money" was in the area of East 74 Street and Central. He dispatched Officer Troy Strong and his partner to investigate the tip. Detective Gilbert informed Officer Strong that the suspect was a black male with a medium complexion, in his early 20's, about six feet tall, and should be wearing a bright yellow jogging suit.
 {¶ 8} On arrival in the area of East 71 Street and Central, Officer Strong identified a suspect matching the description Detective Gilbert had given him. The suspect was detained by Officer Strong for 15 minutes until Detective Gilbert arrived to question him. When the Detective arrived, he made small talk with the suspect and found out that his name was Deshawn White. Detective Gilbert then asked White what his father's name was. When White replied "Oscar Nicks," Detective Gilbert placed him under arrest for the shooting of Nathaniel Woodland
 {¶ 9} Detective Gilbert then took a head-and-shoulders Polaroid photograph of White along with a full-length Polaroid of White wearing his yellow jogging suit. On June 23, 2003, the Detective located the victim and presented him with a Polaroid photo array in order to positively identify the shooter. Out of four photographs, each of which depicted only the heads and shoulders of four different suspects, the victim positively identified Deshawn White as being "D Money," the man who shot him. Detective Gilbert testified that the full length Polaroid photograph taken of "D Money" wearing his yellow jogging suit was not used in the photo array shown to the victim, although it was introduced into evidence at trial.
 {¶ 10} On August 12, 2003, the Cuyahoga County Grand Jury returned a three-count indictment against White. Count one charged White with attempted murder, with one and three year firearm specifications. Counts two and three charged White with felonious assault, both with one and three year firearm specifications. On September 18, 2003, a jury trial commenced. On September 22, 2003, the jury returned a verdict of not guilty pertaining to count one, attempted murder, but found White guilty on counts two and three, felonious assault, with one and three year firearm specifications.
 {¶ 11} On the same day the jury reached its verdict, White voluntarily waived a presentence investigation report and requested that the court impose sentence on him. For the purposes of sentencing, the trial court merged the convictions for felonious assault and also the two firearm specifications. The trial court then sentenced White to a three-year sentence for the firearm specification, to be served prior to and consecutive with a six-year sentence for felonious assault. White received a total of nine years imprisonment.
 {¶ 12} On October 3, 2003, the appellant filed this timely appeal alleging four assignments of error for our review.
 {¶ 13} "I. Trial counsel was ineffective under the Sixth andFourteenth Amendments of the U.S. Constitution."
 {¶ 14} The appellant raises four separate issues for review in support of his ineffective assistance of counsel argument. We find each of these issues to be without merit.
 {¶ 15} In Ohio, when reviewing a claim of ineffective assistance of counsel, it must be presumed that a properly licensed attorney executes his legal duty in an ethical and competent manner. State v. Smith (1985), 17 Ohio St.3d 98,477 N.E.2d 1128; Vaughn v. Maxwell (1965), 2 Ohio St.2d 299,209 N.E.2d 164.
 {¶ 16} In order to substantiate a claim on the basis of ineffective assistance of counsel, the defendant must show first, that counsel's performance was deficient, and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. State v. Jones (2001),91 Ohio St.3d 335, 354, 744 N.E.2d 1163, citing Strickland v. Washington
(1984), 466 U.S. 668, 687, 104 S.Ct. 2052, L. Ed.2d 674. To show such prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v.Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.
 {¶ 17} "Even assuming that counsel's performance was ineffective, this is not sufficient to warrant reversal of a conviction. `An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. Cf. United States v. Morrison, 449 U.S. 361, 364-365 (1981).'"Strickland, supra, at 691.
 {¶ 18} First, the appellant claims that his trial counsel was ineffective for not filing a motion to suppress his admission that Oscar Nicks was his father. The appellant argues this admission, which was obtained through a police interrogation, was illegal because it occurred when the appellant was in custody and before he was read his Miranda rights.
 {¶ 19} It is well settled that "a law enforcement official is permitted to stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that "criminal activity may be afoot," even if the officer lacks probable cause. Terry v. Ohio (1968),392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889. Thus, police officers are generally permitted to approach an individual, even if they have no basis to conclude that he is suspicious, and may ask questions of and request identification from the individual, as long as the police do not convey a message that compliance with their requests is required." Florida v. Bostick (1991),501 U.S. 429, 435, 11 S.Ct. 2382, 115 L.Ed. 389.
 {¶ 20} Pursuant to Miranda, statements "stemming from a custodial interrogation of the defendant" must be suppressed unless the defendant had been informed of his Fifth andSixth Amendment rights before being questioned. "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."Miranda v. Arizona (1966), 384 U.S. 436, S.Ct. 1602,16 L.Ed.2d 694. Interrogation involves express questioning or words or actions reasonably likely to elicit an incriminating response.Rhode Island v. Innis (1980), 446 U.S. 291, 301-302,100 S.Ct. 1682, 64 L.Ed.2d 297.
 {¶ 21} However, police are not required to administerMiranda warnings to everyone they question, even if the questioning takes place at the police station. Oregon v.Mathiason (1977), 429 U.S. 492, 495, 97 S.Ct. 711. Moreover, "an officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether the person is in custody." Stansbury v.California (1994), 511 U.S. 318, 319, 114 S.Ct. 1526,128 L.Ed.2d 293. Instead, the question is whether the suspect has been arrested or restrained from movement to the degree associated with a formal arrest. California v. Beheler (1983),463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275.
 {¶ 22} In the instant matter, Detective Gilbert received a tip that the appellant was in the area of East 74 Street and Central wearing a bright yellow jogging suit. The Detective gave the appellant's description to two police officers, who he dispatched to the area. The officers were told to find the appellant and detain him until the Detective could arrive to question him.
 {¶ 23} Officer Strong testified that he and his partner found the appellant, who exactly matched the description provided by Detective Gilbert, on East 71 Street and Central. Officer Strong testified they approached the appellant from behind and "got" him. Officer Strong then testified that he spoke with the appellant for a few minutes, found out that his name was Deshawn White, and placed him in the back seat of the zone car for about ten minutes.
 {¶ 24} When Detective Gilbert arrived, he asked the appellant everyday, common questions in order to loosen him up. Detective Gilbert then asked the appellant a critical question, "What's your father's name?" When the appellant answered "Oscar Nicks," the Detective arrested him for the shooting of Nathaniel Woodland and read him his Miranda rights.
 {¶ 25} It is unclear from the record whether the appellant voluntarily entered the rear of the zone car and submitted to the Detective's questions. Even if we were to assume that the appellant was subjected to a custodial interrogation without first being read his Miranda rights when he was placed into the rear of the zone car, we cannot hold that the appellant made an incriminating statement that should have been suppressed.
 {¶ 26} The appellant simply stated to Detective Gilbert that his father's name is Oscar Nicks. This statement was only used to determine the identity of the suspect and was not an incriminating statement. Since the victim only knew the appellant by the name of "D Money," but knew his father's name was Oscar Nicks, the identification of the appellant's father was the only way Detective Gilbert could have known that the appellant was indeed the suspect he was looking for. Therefore, because this admission made by the appellant was only used to identify him and is not incriminating in any way, defense counsel had no reason to file a motion to suppress it.
 {¶ 27} Second, the appellant argues that his counsel was ineffective by failing to file a motion to suppress the testimony and evidence regarding the identification of the appellant by the victim using the Polaroid photo array. The appellant argues that the Polaroid photo array was unnecessarily suggestive because two out of the five photographs shown to the victim were of the appellant and also because he was photographed wearing a bright yellow jogging suit.
 {¶ 28} The Supreme Court of Ohio in State v. Wogenstahl
(1996), 75 Ohio St.3d 344, 363, 662 N.E.2d 311, held "* * * where a witness has been confronted by a suspect before trial, that witness's identification of the suspect will be suppressed if the confrontation procedure was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the totality of the circumstances." Manson v. Brathwaite
(1977), 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140.
 {¶ 29} Reliability is the key in determining the admissibility of identification testimony. The United States Supreme Court established the following five factors to determine reliability: the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. Neil v. Biggers (1972), 409 U.S. 188, 199-200.
 {¶ 30} However, even assuming a pretrial identification procedure is impermissibly suggestive, an in-court identification is permissible where the prosecution establishes by clear and convincing evidence that the witness had a reliable, independent basis for the identification based on prior independent observations made at the scene of the crime. State v. Jenkins
(Jan. 15, 2004), Cuyahoga App. No. 82622.
 {¶ 31} In the instant matter, the appellant claims that the victim was shown five Polaroid photographs, two of which were of the appellant. We find that the appellant has misstated the facts in the record as they relate to the Polaroid photo array that was shown to the victim.
 {¶ 32} Five Polaroid photographs labeled J, K, L, M, and O were submitted into evidence at trial. Exhibit O featured a full length photograph of the appellant wearing a bright yellow jogging suit. Exhibit K was a Polaroid photograph of the appellant's head and shoulders. Exhibit J, M, and L were photographs of other suspects with each photograph depicting only the head and shoulders of each suspect.
 {¶ 33} The record in this case indicates that the victim was shown only four Polaroid photographs, Exhibits J, M, L, and K, in order to identify the shooter. (Testimony of Detective Gilbert, Tr. at 331-332 and testimony of Nathaniel Woodland, Tr. at 297). Each photograph depicted only the head and shoulders of each possible suspect. Exhibit O, which was a full-length picture of the appellant taken by Detective Gilbert, was never shown to the victim until he was testifying at trial. Therefore, out of four Polaroid pictures of different individuals, the victim positively identified the appellant as the person who shot him.
 {¶ 34} Furthermore, after his initial interview with the victim, Detective Gilbert entered the names "D Money" and "Demerrius" into the police computer in order to ascertain the identity of the shooter. While the victim was in the hospital, Detective Gilbert presented him with a different photo array that did not contain a photograph of the appellant; the victim stated that the person who shot him was not depicted in that photo array.
 {¶ 35} The appellant further claims that the photograph of his head and shoulders was unnecessarily suggestive because he was the only suspect photographed wearing a bright yellow jogging suit. We find no merit to the appellant's argument.
 {¶ 36} The victim had an independent basis for identifying the appellant as the person that shot him apart from the Polaroid photo array. The victim testified that he had a lengthy conversation with the appellant before the appellant took out his firearm and shot at him. He further testified that, even though the shooting took place around 12:30 a.m., the light on the porch of the crack house was on, and he could clearly see the appellant's face. In addition, the victim's prior description of the appellant as being a black male with medium brown skin, six-feet-one-inch tall, hair low, with a mustache, and about 23 years of age, exactly matched the description of the appellant. Also, the victim was absolutely certain that it was the appellant who had shot him. The victim stated that he had known the appellant for some time and interacted with him on a daily basis. The victim further stated that, "I know who shot me, I sold dope for him every night." (Tr. at 283, also see Tr. at 204 and 223). Last, only about ten days passed from the time that the victim was shot until he positively identified the appellant as being the person who shot him.
 {¶ 37} After reviewing the record, we cannot say that the appellant's trial counsel was ineffective for failing to file a motion to suppress the evidence and testimony relating to the Polaroid photo array. We find that the Polaroid photo array was not impermissibly suggestive and, even assuming it was, a suppression hearing would not have prevented the victim's in-court identification of the appellant; hence, there would have been no change in the outcome of the trial.
 {¶ 38} Last, the appellant argues that his trial counsel was ineffective because counsel advised him to waive a presentence investigation report and be sentenced the same day that the verdict was rendered. Also, the appellant claims that his trial counsel failed to object during sentencing to the trial court's finding that the appellant had shown no remorse for committing this crime.
 {¶ 39} We recognize that courts must be highly deferential to counsel's performance and will not second-guess trial strategy decisions. State v. Tibbetts (2001), 92 Ohio St.3d 143, 166,749 N.E.2d 674. We find that the appellant waived his presentence investigation report as a strategy tactic. This case is not the first time the appellant was convicted of a felony. The record indicates that he had been convicted of felonies on at least two prior occasions and served time in prison. Furthermore, waiving the presentence investigation report prevented the trial court from obtaining the appellant's juvenile record. Also, the appellant had various members of his family present in court on the day of the verdict. The appellant, for the purposes of convenience, may have wanted to be sentenced the same day and waive his presentence investigation report in order to have his family plead to the court for leniency; the record indicates they did.
 {¶ 40} Last, the appellant argues that his trial counsel was ineffective when he failed to object to a comment made by the trial court that the appellant had shown no remorse for the crime he committed against the victim, then subsequently used it as a factor when determining his sentence. We find the appellant's argument to be without merit.
 {¶ 41} After being convicted, the appellant continued to maintain his innocence and denied committing the crime or even knowing the victim. The appellant stated:
 {¶ 42} "And I hate for this victim to accuse me like this, he don't know me like this. It's hate.
 {¶ 43} "The simple fact, I cannot deny that I be in that area on Central because my kids stay down there. But I did not do this to this victim, though. I respect your law * * *." (Tr. at 583).
 {¶ 44} Given the appellant's statements made during sentencing, it was not error for the trial court to conclude that the appellant did not show genuine remorse. The trial court stated:
 {¶ 45} "I understand what you're saying. One of the other factors in terms of recidivism more likely is does the offender show genuine remorse? Since you're maintaining your innocence, there's no genuine remorse. And it is what it is." (Tr. at 583).
 {¶ 46} After reviewing the record and all of the appellant's ineffective assistance of counsel arguments, we find that the appellant has failed to show that his trial counsel's performance was deficient in some way; therefore, the appellant's first assignment of error is overruled.
 {¶ 47} "II. The trial court failed to comply with R.C.2929.11(B) and State v. Comer, supra, when it failed to insure that the sentence imposed was consistent with similar sentences for similar offenses."
 {¶ 48} Abuse of discretion is not the standard of review with respect to sentencing; instead, an appellate court must find error by clear and convincing evidence. R.C. 2953.08(G)(2) provides that an appellate court may not increase, reduce, or otherwise modify a sentence imposed under Senate Bill 2 unless it finds by clear and convincing evidence that the sentence is not supported by the record or is contrary to law.
 {¶ 49} Clear and convincing evidence is more than a mere preponderance of the evidence; it is that evidence" which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." State v.Garcia (1998), 126 Ohio App.3d 485, 710 N.E.2d 783, citing Cincinnati Bar Assn. v. Massengale (1991),58 Ohio St.3d 121, 122, 568 N.E.2d 1222. When reviewing the propriety of the sentence imposed, an appellate court shall examine the record, including the oral or written statements at the sentencing hearing and the presentence investigation report. R.C.2953.08(F)(1)-(4).
 {¶ 50} In the instant case, the appellant was afforded a full sentencing hearing under R.C. 2929.19. Prior to sentencing, the court had an opportunity to hear from the appellant, his counsel, and three members of his family. The trial court stated that the appellant was not credible and had shown a history of recidivism. The trial court found that prison was necessary to protect the public from future crime by the appellant and that the seriousness of the physical harm and pain the victim endured warranted a six year prison sentence. Therefore, we find a six year sentence for felonious assault supported by the record and not contrary to law. The appellant's second assignment of error is hereby overruled.
 {¶ 51} The appellant's third and fourth assignments of error[1] claim that the jury verdict was against the manifest weight of the evidence and/or, in the alternative, the evidence was insufficient to support the appellant's conviction. However, both assignments of error were based on the suppression issues in appellant's first assignment of error, which was overruled. Since we have held that neither the photo array nor the admission as to the name of the appellant's father should have been suppressed, the remaining assignments of error are hereby rendered moot.
 {¶ 52} The judgment is affirmed.
Judgment affirmed.
Corrigan, A.J., and Calabrese, Jr., J., concur.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
[1] "III. The verdict is against the manifest weight of the evidence."
"IV. The evidence is insufficient and the appellant's rights to Due Process under the Fourteenth Amendment of the U.S. Constitution were violated."